**Opinion filed February 27, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-25-00255-CV
_____

## IN THE INTEREST OF K.H., K.A., AND K.A., CHILDREN

**On Appeal from the 326th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 11258-CX**

### M E M O R A N D U M   O P I N I O N

This is an accelerated appeal from the trial court's order terminating Appellant's[1] parental rights to two of her children, K.A. and K.A.2.[2]  In two issues, Appellant challenges the sufficiency of the evidence to support the trial court's finding that the termination of her parental rights is in best interest of K.A. and

---

[1]The trial court also terminated the parental rights of the alleged and unknown fathers of K.A., and, in a separate order, it appointed Appellant possessory conservator of her oldest child, K.H.  Only the mother filed a notice of appeal, and she does not contest the trial court's order appointing her as possessory conservator of K.H.

[2]We use initials to refer to the children.  *See* TEX. R. APP. P. 9.8(b).

K.A.2.  *See* TEX. FAM. CODE ANN. §§ 161.001(b)(2) (West Supp. 2025).  We affirm the trial court's order.

## I. *Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence.  FAM. § 161.001(b).  To terminate one's parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1), and that termination is in the best interest of the children.  *Id.*  Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *Id.* § 101.007 (West 2019).

In this case, the trial court found that clear and convincing evidence established that Appellant: (1) knowingly placed or knowingly allowed K.A. and K.A.2 to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; and (2) engaged in conduct or knowingly placed K.A. and K.A.2 with persons who engaged in conduct which endangered the physical or emotional well-being of the children.  *See id.* § 161.001(b)(1)(D), (E).  The trial court further found that termination of Appellant's parental rights was in K.A.'s and K.A.2's best interest.  *See id.* § 161.001(b)(2).

In reviewing a legal sufficiency challenge, we must decide whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."  *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).  Cognizant of the required appellate deference to the factfinder, "we look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible."  *Id.* (internal quotation marks omitted).  "However, we may not disregard 'undisputed facts that do not support the finding,'" and the factfinder is "the sole arbiter of the

2

witnesses' credibility and demeanor." *Id.* (first quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); and then quoting *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021)). As such, when considering the credibility of the evidence presented, we may not substitute our judgment for that of the factfinder. *J.F.-G.*, 627 S.W.3d at 316.

In assessing whether the evidence is factually sufficient, we weigh the disputed evidence that is contrary to the finding against all the evidence that favors the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002); *In re L.C.C.*, 667 S.W.3d 510, 512 (Tex. App.—Eastland 2023, pet. denied). Because a trial court conducting a de novo hearing "may also consider the record from the hearing before the associate judge," we may also do so if it is included in the appellate record, as it is here. *See* FAM. § 201.015(c) (West 2020); *In re A.L.M.-F.*, 593 S.W.3d 271, 277 (Tex. 2019) ("[R]eview under [S]ection 201.015 is not entirely independent of the proceedings before the associate judge.").

With respect to the best interest of the children, no unique set of factors need be proved. *L.C.C.*, 667 S.W.3d at 513; *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). Further, the best interest determination does not restrict the proof to any specific factor or factors. *In re J.S.*, 687 S.W.3d 541, 547 (Tex. App.—Eastland 2024, no pet.). However, courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these

individuals to promote the best interest of the children; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

To support a best interest finding, the Texas Department of Family and Protective Services (the Department) is not required to prove each *Holley* factor; in some circumstances, evidence of the presence of only one factor will suffice. *C.H.*, 89 S.W.3d at 27; *In re D.M.*, 452 S.W.3d 462, 473 (Tex. App.—San Antonio 2014, no pet.). Additionally, the same evidence that proves one or more statutory grounds for termination may also constitute sufficient, probative evidence illustrating that termination is in the children's best interest. *C.H.*, 89 S.W.3d at 28; *C.J.O.*, 325 S.W.3d at 266.

The absence of evidence of some *Holley* considerations does not preclude the factfinder from reasonably inferring or forming a strong conviction or belief that termination is in the children's best interest, particularly if the evidence indicates that the parent-child relationship and the parent's conduct has endangered the safety and well-being of the children. *C.H.*, 89 S.W.3d at 27. This is so because the best interest analysis evaluates the best interest of the children, not the parent. *J.S.*, 687 S.W.3d at 548; *In re E.C.R.*, 638 S.W.3d 755, 767 (Tex. App.—Amarillo 2021, pet. denied) (citing *In re B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.)).

In this regard, the factfinder may measure a parent's future conduct by their past conduct in determining whether termination of a parent's parental rights is in the children's best interest. *J.S.*, 687 S.W.3d at 548; *In re Z.R.M.*, 665 S.W.3d 825, 829 (Tex. App.—San Antonio 2023, pet. denied); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). The factfinder may infer that a parent's past

4

conduct that endangered the safety and well-being of the children may recur in the future if the children are returned to the possession of the parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied). Additionally, the factfinder may infer from a parent's past inability to meet the children's physical and emotional needs an inability or unwillingness by the parent to meet the children's physical and emotional needs in the future. *J.D.*, 436 S.W.3d at 118; *see also In re A.S.*, No. 11-16-00293-CV, 2017 WL 1275614, at *3 (Tex. App.—Eastland Mar. 31, 2017, no pet.) (mem. op.).

## II. *The Evidence Presented at Trial*

Appellant and her three children, K.H., K.A., and K.A.2, resided in Mississippi until 2022. K.H. was born in December 2016 when Appellant was fourteen. In 2018, K.H.'s father was sentenced to imprisonment in a Mississippi state court for two counts of automobile theft. K.H.'s paternal grandmother, R.H., maintained a close relationship with K.H. and Appellant, and she continued helping Appellant with childcare after K.A. and K.A.2 were born. When R.H. and her two teenage sons moved to Texas in 2022, Appellant sent five-year-old K.H. and ten-month-old K.A.2 with them while she and K.A. remained in Mississippi.

In June 2023, the Department investigated allegations of physical abuse and drug use in R.H.'s home in Abilene. R.H. and the four children in her care participated in family-based safety services[3] (FBSS), but drug use in the home continued in violation of the safety plan. Appellant and K.A. were still living in

---

[3]"Family-based safety services are protective services provided to a family whose children are not in the conservatorship of the Department." 40 TEX. ADMIN. CODE ANN. § 700.710 (2021). The Department's Child Protective Services Division provides family-based safety services to families and children "to: (1) protect the children from abuse and neglect; (2) help the family reduce the risk of future abuse or neglect; and (3) prevent the removal of the children from their home." *Id.* Specifically, the family was ordered to participate in services through the Texas Family First (TFF) pilot program. *See* FAM. §§ 262.402–.410 (authorizing and implementing the Family Preservation Services Pilot Program).

Mississippi, and R.H. reported that Appellant "had not seen her children in quite some time." R.H. explained that she was K.H.'s and K.A.2's primary caregiver because Appellant "was having a hard time taking care of all of [her] children."

The Department was unable to contact Appellant during the FBSS phase, but R.H. kept her informed during their weekly video calls. Appellant was also notified of the Department's previous involvement with R.H. in December 2022. Despite the possibility of removal, Appellant did not travel to Abilene until the Department was granted temporary managing conservatorship of K.H. and K.A.2 on October 16, 2023. When Appellant contacted the Department days later "[t]o retrieve [her] kids," she was required to submit to drug testing. Appellant tested positive for cocaine and marihuana but she denied using drugs. Following court-ordered drug testing of K.H. and K.A.2 soon after removal, K.A.2 tested positive for methamphetamine and marihuana. Although Appellant brought K.A. with her to Abilene, K.A. was not subjected to drug testing until April 2024—Appellant initially concealed that K.A. was with her and reported that the child was with her father in Mississippi.

The Department created a family plan of service for Appellant in December 2023 that the trial court modified, approved, and adopted as an order of the court. As part of Appellant's service plan, she was required to complete parenting classes, counseling, and submit to random drug screens. Appellant was also required to maintain weekly contact with her permanency case manager, refrain from criminal activity, permit home visits by the Department, establish a safe, stable household for the children, and participate in scheduled parent-child visitation.

For the first few months after removal, Appellant and K.A. stayed with R.H. During a home visit, Cyndi Hall, Appellant's first permanency case manager, noticed the smell of "mari[h]uana as soon as [she] stepped near the doorway." She was also concerned by the number of unidentified adults going "in and out of the

home" and that "[i]t took several minutes for them to answer the door [and] to get [Appellant] after they answered the door." Appellant and K.A. then moved in with Ryan Washington, her boyfriend at the time, who was ordered to submit to drug testing and participate in services. The Department also drug tested K.A. after learning that she lived with Appellant, who misrepresented that she had recently retrieved K.A. from Mississippi. In April 2024, K.A. tested positive for cocaine and methamphetamine, and Washington tested positive for cocaine and marihuana. Appellant told the Department investigator Kianna Alexander that Washington did not use drugs and attributed his and K.A.'s positive test results to exposure while in R.H.'s home. Alexander was unable to implement a safety plan because Appellant had no approved caregivers to serve as a safety monitor. The Department thus sought and was granted temporary managing conservatorship of K.A.

In July 2024, Hall secured an apartment for Appellant and used Department funds to pay the deposit and first month's rent. However, Hall observed during a home visit that "[i]t did not appear that [Appellant] lived in the apartment" and suspected that Appellant was still living with Washington. Appellant was ultimately evicted and later confirmed that she had been dating and cohabitating with Washington for the duration of the case.

Appellant "struggled" to attend weekly supervised visitation with her children, which was scheduled for the same day and time every week. Appellant "probably missed one [out] of three visits at least" because she claimed that they conflicted with her work schedule or that she had to travel to Mississippi. The visitation schedule was adjusted to every other week, at Appellant's request, but her attendance never improved. She frequently cancelled visits shortly before they were to begin, but after the children had already been transported to the meeting location. When Appellant did attend a visitation session, "she had a difficult time engaging with the kids" and would use her cell phone or play video games instead of talking

to or interacting with the children. Appellant also gave K.A.2 food that caused an allergic reaction despite K.A. informing her that K.A.2 "wasn't allowed to have that food." Hall recalled another occasion when Appellant "was noticeably upset about having to do the visit at McDonald's," and K.A. had to convince her to come inside.

By October 2024, Appellant consistently missed her bi-monthly visits with K.A. and K.A.2. Her visitation schedule was eventually modified and reduced to weekly thirty-minute virtual visits with all the children, which she participated in sporadically. Kendra Kirksey, the permanency case manager at that time, observed that "[K.H.] got most of the attention" during the virtual visits. Appellant also missed the virtual visit on Easter Sunday. Sue Thomesen, the children's Court Appointed Special Advocate (CASA), lamented that Appellant's absences are "a disappointment" to the children. Thomesen was concerned about Appellant's ability to care for her children on a full-time basis due to her failure to attend the thirty-minute weekly visits.

Appellant only participated in one or two counseling sessions then stopped attending. She complied with her drug testing obligations until August 2024—"she started to take a little bit longer," used work as an excuse, would agree to be there but then not appear, or "just wouldn't respond." In October 2024, Appellant tested positive for cocaine, and Washington tested positive for cocaine, methamphetamine, and marihuana. Kirksey was also unable to assess the safety of Appellant's and Washington's duplex because Appellant never allowed her inside.

K.H. and K.A.2 were placed in the same foster home together after removal until K.H. was moved because of his behavioral issues. K.A.2 remained in her placement for the duration of the case; she "loves it there," knows that as her home, and has bonded with her foster parents, who wish to adopt her. K.A. was placed in a separate foster home after she was removed, and formed an immediate connection with her foster mother, N.O. After almost a month in N.O.'s home, K.A. was sent

to live with K.A.2 and her foster parents. Kirksey and the foster parents observed that K.A. was unhappy there, so she returned to N.O.'s home around January 2025 and has been there since that time. She is "doing great," is "very happy," and "feels safe in [N.O.'s] home." N.O. and K.A.2's foster parents have a close relationship and arrange frequent video calls between K.A. and K.A.2. According to the Department's case managers, Thomesen, and the girls' foster parents, terminating Appellant's parental rights to K.A. and K.A.2 was in the children's best interest.

The final termination hearing was held on April 14 and April 29, 2025, before the associate judge assigned by the district court. After the Department rested its case-in-chief, Appellant testified. She did not dispute that she missed parent-child visitation but stated that she was working two jobs that conflicted with the inflexible visitation schedule. Before K.A. was removed, Washington watched her while Appellant was working. Appellant and Washington were living in a motel room at the time of trial, but they had signed a lease for a house and were intending to move in. Regarding childcare, Appellant did not have a plan if the children were returned to her.

Appellant was arrested in February 2025 for committing family violence but testified that "it really wasn't fair." She initially denied any criminal history for Washington, then admitted that he was arrested for an alcohol-related offense—she believed it was for driving under the influence—"while he was at work . . . [h]e was going on [a] break or something like that." Appellant maintained that neither she nor Washington used drugs and reiterated that they were likely exposed to drugs while at R.H.'s house.

Appellant was questioned about a drive-by shooting of R.H.'s home that occurred in Mississippi shortly before their move to Abilene. K.H., who was four or five, was in the home when the shooting occurred. She recalled that R.H. "was in fear for her sons" and believed that it may have prompted the family's sudden

9

upheaval. Appellant testified that she did not know whether the shooting was gang-related and was not concerned about one occurring in Texas. According to Appellant, "[W]hy would that happen if you don't know [any]body?"

At the conclusion of the hearing, the associate judge terminated Appellant's parental rights to K.A. and K.A.2 under Sections 161.001(b)(1)(D) and (E) and found termination to be in the best interest of the two children. The associate judge denied the petition to terminate Appellant's parental rights to K.H. and appointed her possessory conservator of K.H.

The referring court granted Appellant's request for a de novo hearing, and the parties reconvened on August 1, 2025. In addition to reviewing the transcripts and exhibits from the first hearing, evidence was presented to the referring court that Appellant was arrested on June 12, 2025, for driving while intoxicated. Between April and August, Appellant attended two parent-child visitations and "no-showed" for the other thirteen. The Department changed the time of the weekly virtual visits to accommodate Appellant's church schedule; she nonetheless missed the virtual visits without notice. The referring court adopted the associate judge's rulings and findings, then issued its termination order as to K.A. and K.A.2 pursuant to Sections 161.001(b)(1)(D), (E), and (b)(2). *See* FAM. § 161.001(b)(1)(D), (E), (b)(2). On appeal, Appellant challenges the final order terminating her parental rights to K.A. and K.A.2.

## III. *The Best Interest of the Children*

Appellant challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in the best interest of K.A. and K.A.2. "'[B]est interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (quoting *Holley*, 544 S.W.2d at 371–72). We reiterate that the trial court, as the trier of fact, is the sole

10

judge of the witnesses' credibility. *J.F.-G.*, 627 S.W.3d at 312. We are not at liberty to disturb the determinations of the factfinder so long as those determinations are not unreasonable. *Id.* at 311–12; *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Giving the requisite due deference to the trier of fact, we hold that, based on the evidence in the record and the application of the *Holley* factors, the trial court could have formed a firm belief or conviction that termination of Appellant's parental rights was in the best interest of K.A. and K.A.2. *See Holley*, 544 S.W.2d at 371–72.

Evidence of each *Holley* factor is not required to support a best interest finding. *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re S.O.*, No. 05-22-01019-CV, 2023 WL 2237084, at *11 (Tex. App.—Dallas Feb. 27, 2023, no pet.) (mem. op.). In other words, the absence of evidence regarding some of these factors does not preclude a best interest finding, "particularly if [the] undisputed evidence shows the parental relationship endangered the child's safety." *In re N.T.*, 474 S.W.3d 465, 477 (Tex. App.—Dallas 2015, no pet.) (quoting *In re A.E.*, No. 05-14-01340-CV, 2015 WL 1184179, at *6 (Tex. App.—Dallas Mar. 16, 2015, pet. denied) (mem. op.)). Consequently, "evidence relating to one single factor may be adequate in a particular situation to support a finding that termination is in the best interest[] of the child." *J.S.*, 687 S.W.3d at 552 (quoting *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.)). And evidence that is relevant to Section 161.001(b)(1) termination grounds may be probative of a child's best interest. *See In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013) (citing *C.H.*, 89 S.W.3d at 28).

Appellant does not contest the trial court's findings that she endangered K.A. and K.A.2 as set forth in Section 161.001(b)(1)(D) and (E). So long as the evidence supports those findings, they are valid grounds for termination. *See E.C.R.*, 402 S.W.3d at 249–50; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *J.S.*, 687 S.W.3d at 552. In this regard, the evidence that Appellant endangered her children could

also be considered by the factfinder in determining whether termination was in K.A.'s and K.A.2's best interest. *See E.C.R.*, 402 S.W.3d at 249–50; *C.J.O.*, 325 S.W.3d at 266.

Notably, a parent's failure to remove a child from an endangering environment can support termination if the parent is aware of the dangerous conditions or surroundings. *See J.G. v. Tex. Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.); *In re A.L.H.*, 468 S.W.3d 738, 746 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Here, the evidence that Appellant endangered K.A. and K.A.2 by placing them in and failing to remove them from an endangering environment also supports the trial court's best interest finding.

Appellant sent her five-year-old son and ten-month-old daughter to live with R.H. and R.H.'s teenage sons for over a year before the Department filed the original petition in this case. Notwithstanding the drive-by shooting of R.H.'s Mississippi home for which K.H. was present, Appellant professed ignorance of R.H.'s sons' gang involvement. However, Appellant knew that the family relocated because R.H. feared for her sons' safety after the shooting. And because R.H. and her sons did not know anyone in Texas, Appellant believed that there would be no risk of similar dangers here. Evidently, Appellant was at least aware that the shooting was personal, and that R.H.'s sons were targeted. While not conclusive, this evidence is indicative of a potential danger that Appellant ignored. *See, e.g.*, *In re N.J.H.*, 575 S.W.3d 822, 832 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("[E[vidence that a person has engaged in [violent criminal] conduct in the past permits an inference that the person will continue [to engage in] violent behavior in the future.").

Assuming that Appellant was ignorant of the dangerous conditions and surroundings in R.H.'s home prior to the removal of K.H. and K.A.2, she indisputably became aware of this after K.A.2 tested positive for methamphetamine

and marihuana. Appellant also tested positive for cocaine and marihuana in October 2023. Hall smelled marihuana when she approached R.H.'s home while Appellant was living there and secreting K.A. from the Department. Hall also observed unknown people entering and leaving R.H.'s home.

When Appellant and Washington tested positive for cocaine and K.A. tested positive for cocaine and methamphetamine, Appellant attributed their positive drug test results to drug exposure while being at R.H.'s house. The trial court was free to discredit Appellant's proffered excuses for the positive drug test results, especially because the evidence supports the alternative—that Appellant and Washington exposed K.A. to illegal drugs through their own use. *See In re Z.R.*, No. 02-25-00268-CV, 2025 WL 3181160, at *13 (Tex. App.—Fort Worth Nov. 13, 2025, no pet.) (mem. op.) (considering the children's positive drug test results, the mother's drug use, and her leaving the children in the care of another known drug user in best interest analysis). Appellant's conduct demonstrates her inability to meet the physical and emotional needs of K.A. and K.A.2, and casts doubt on her parenting abilities. *See In re U.G.G.*, 573 S.W.3d 391, 402 (Tex. App.—El Paso 2019, no pet.) ("In reviewing the parenting abilities of a parent, a fact finder can consider the parent's past neglect or past inability to meet the physical and emotional needs of the children.").

In any event, Appellant continued to expose herself, Washington, and K.A. to those conditions, and her solution was for K.A. to wear shoes and "not touch [any]thing" rather than to avoid the endangering environment altogether. Even after K.A. tested positive and was removed, Appellant and Washington spent time in R.H.'s home until R.H. changed residences. Appellant's attempt to elude culpability by blaming others in R.H.'s home confirms that she was aware of and disregarded its endangering conditions and surroundings. *See In re S.V.*, No. 02-23-00188-CV, 2023 WL 5967890, at *9 (Tex. App.—Fort Worth Sept. 14, 2023, no pet.) (mem.

op.) ("both drugs and drug users were finding their way into the children's home"); *M.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-17-00104-CV, 2017 WL 3379114, at *5 (Tex. App.—Austin Aug. 1, 2017, no pet.) (mem. op.) (considering a parent's continued association with "people who smoke marihuana all the time" as evidence of endangerment).

Further, Appellant's repeated disregard for the well-being of K.A. and K.A.2 demonstrates a pattern of parental indifference, which "supports a finding that termination of parental rights is in a child's best interest under every one of the *Holley* factors." *In re A.J.D.-J.*, 667 S.W.3d 813, 823 (Tex. App.—Houston [1st Dist.] 2023, no pet.). As the case progressed, Appellant became increasingly apathetic. She began ignoring directives to submit to drug testing, missed more scheduled visits than she attended, and stopped checking in weekly with her caseworker. The trial court may infer from a parent's refusal to submit to drug testing that the parent is using drugs. *In re M.S.*, 662 S.W.3d 620, 629 (Tex. App.—Beaumont 2023, pet. denied). Appellant's sporadic attendance for parent-child visitations only when it suited her—even after they were reduced to weekly half-hour virtual visits—jeopardized K.A.'s and K.A.2's emotional well-being. *A.J.D.-J.*, 667 S.W.3d at 834. Logically, "an uninterested parent poses an emotional and physical danger to the child" now and in the future and here shows Appellant's unwillingness or inability to meet her children's needs now and in the future. *Id.* at 823; *see Holley*, 544 S.W.2d at 371–72.

"Stability and permanence are paramount in the upbringing of children." *In re J.A.R.*, 696 S.W.3d 245, 257 (Tex. App.—Houston [14th Dist.] 2024, pet. denied). The factfinder may compare the parent's and the Department's plans for the children and determine whether the plans and expectations are realistic or weak and ill-defined. *U.G.G.*, 573 S.W.3d at 402. The stability of K.A.'s and K.A.2's respective adoptive placements was not in dispute. The evidence demonstrated that the girls

are safe and happy in their placements, and it "would be so disruptive" to remove them from their adoptive homes. Appellant, by contrast, has not demonstrated the ability to maintain a safe, stable, drug-free home environment for K.A. and K.A.2 and she continued living with Washington despite his positive drug tests. Appellant also knew that Washington had been arrested in the past, initially denied his criminal history, then minimized his criminal conduct—stating rhetorically, "if you call that a criminal." Notwithstanding the Department's admonitions, before K.A.'s removal, Appellant left K.A. in Washington's care when she had to work. The record therefore discloses several circumstances from which the trial court may have reasonably discerned "a pattern of conduct that is inimical to the very idea of child-rearing." *J.F.-G.*, 627 S.W.3d at 316 (quoting *C.H.*, 89 S.W.3d at 28); *Holley*, 544 S.W.2d at 371–72. Such conduct indicates that the existing parent-child relationship is not a proper one, which supports the trial court's best interest finding. *See Holley*, 544 S.W.2d at 371–72.

Appellant's indifferent attitude, absence from K.A.'s and K.A.2's lives, and minimal efforts to be involved in the decisions regarding their health or well-being are acts and omissions that exposed K.A. and K.A.2 to physical and emotional loss. *See In re N.L.S.*, 715 S.W.3d 760, 766 (Tex. 2025) (citing *J.F.-G.*, 627 S.W.3d at 315, 318). For example, Appellant testified that she and Washington were moving into a house, but when asked how many bedrooms it had, she answered, "However many you want the[re] to be . . . [i]t can be three . . . could be two . . . could be one." The evidence, taken together, permits the rational inference that relinquishing K.A. and K.A.2 to Appellant's care would subject them to a life of uncertainty and instability, which is contrary to their best interest. *See J.W.*, 645 S.W.3d at 742 (considering the parent's unstable and uncertain living situation in upholding the trial court's best interest finding); *In re E.M.*, No. 11-24-00310-CV, 2025

15

WL 1240792, at \*10 (Tex. App.—Eastland Apr. 30, 2025, no pet.) (mem. op.) (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Given the child-centered focus of the best interest inquiry, the trial court could properly afford great weight to the evidence of K.A.'s and K.A.2's improvement since removal. *See J.W.*, 645 S.W.3d at 742. The evidence showed that K.A. and K.A.2 were doing well in their current placements, and that it would be detrimental to their physical and emotional well-being to uproot them from those homes. K.A., who was almost six, "expressed multiple times that she just wants to stay with [N.O.]" and "wants [N.O.] to be her mom." N.O. is attentive to K.A.'s physical and emotional needs and makes her feel safe. K.A.2 was three at the time of the final hearing in April and had not articulated her desires. When children are too young to express their desires, the factfinder may consider whether the children have bonded with their caregivers, are well-cared for by them, and whether the children have spent minimal time with a parent. *In re E.J.M.*, 673 S.W.3d 310, 334 (Tex. App.—San Antonio 2023, no pet.); *see also N.J.H.*, 575 S.W.3d at 834 (evidence showing that a young child had bonded with foster family supported a best interest finding). The evidence demonstrated that K.A.2 is happy in her current placement, has formed a bond with her foster parents, and is well-cared for by them. Additionally, K.A.2's foster mother testified that during the last several visits before the final hearing, K.A.2 did not want to speak to Appellant. K.A. and K.A.2's close bonds with their current caregivers and the stability of their respective placements support the trial court's best interest finding. *See Holley*, 544 S.W.2d at 372.

Considering the evidence as it relates to Appellant's actions and inactions, the emotional and physical danger to K.A. and K.A.2 now and in the future, the emotional and physical needs of K.A. and K.A.2 now and in the future, Appellant's lack of parental abilities and stability, and Appellant's criminal conduct and drug use, we hold that the evidence is legally and factually sufficient to support the trial

court's finding that termination of Appellant's parental rights is in the best interest of K.A. and K.A.2.  *See J.W.*, 645 S.W.3d at 741; *Holley*, 544 S.W.2d at 371–72.

Accordingly, we overrule each of Appellant's issues on appeal.

IV.  *This Court's Ruling*

We affirm the order of the trial court.


W. STACY TROTTER

JUSTICE


February 27, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.